FELIPE CASTRO BETANCOURT, demandante y apelado, *v.*
    PAYCO, INCORPORATED y THE GREAT AMERICAN IN-
    DEMNITY COMPANY, demandadas y apelantes.

Número 10632.
*Sometido:* 18 de noviembre de 1952.  *Resuelto:* 30 de junio de 1953.

64

*Luis Blanco Lugo* y *R. Rivera Zayas, G. Rivera Cestero* y *Milton F. Rúa,* abogados, respectivamente, de los apelantes; *Romany & Romany,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

Felipe Castro Betancourt instó demanda de daños y perjuicios contra Payco Inc. y The Great American Indemnity Company. Alegó que allá para el 28 de enero de 1950 la demandada Payco Inc. le vendió por mediación de su empleado Félix Rodríguez un mantecado de coco como propio para el consumo humano y que a consecuencia de haberlo comido sufrió una fuerte intoxicación que le produjo náuseas, vómitos profusos, diarreas agudas y grandes dolores corporales y mentales, todo lo cual le obligó a hospitalizarse y a recibir atención médica. A la Great American Indemnity Company la hizo parte como aseguradora de Payco Inc. (¹)

Ambas demandadas negaron los hechos esenciales de la demanda, y como defensas especiales Payco Inc. sostuvo que en la confección y elaboración de los mantecados que expende para consumo público ejerce igual o idéntico grado de cuidado que el ejercido por las demás personas que se dedican al mismo negocio y que asumiendo que los hechos alegados en la demanda fueran ciertos, el demandante compró el producto por ella elaborado cuando el mismo había salido de su control y supervisión inmediatos, así como que la demanda no aduce hechos constitutivos de una causa de acción. Fué el pleito a juicio, las partes adujeron prueba y el tribunal a quo dictó sentencia declarando con lugar la demanda y condenando a las demandadas a pagar al demandante, solidariamente, la suma de $300 por concepto de daños y perjuicios,

---

(¹)Véase la sección 175 de la Ley 66 de 1921 (pág. 523), según fué enmendada por la núm. 19 de 15 de abril de 1929 (pág. 161).

intéreses legales desde la fecha de la radicación de la demanda hasta su completo pago, más las costas y $150 para honorarios de abogado. Se fundó la sentencia en una opinión que contiene las siguientes conclusiones de hechos:

"Que la corporación Payco Incorporated se dedica a la venta de mantecado para el consumo humano y . . . en la explotación de ese negocio utiliza vendedores ambulantes, a quienes les proporciona carritos para la venta del referido producto.

"Que uno de sus vendedores ambulantes era Félix Rodríguez, a quien entregaba todas las mañanas, además del carrito, cierta cantidad de mantecado para la venta, y que Félix Rodríguez por la tarde devolvía el mantecado que no vendía y cobraba por su trabajo centavo y medio por cada paquete de mantecado que vendía a razón de cinco centavos el paquete.

"Que el día 27 de enero de 1950 Félix Rodríguez salió como de costumbre con el carrito que le proporcionó la demandada Payco Incorporated y fué a la escuela de la Porto Rico Commercial Institute, Inc., sita en la Avenida Luis Muñoz Marín, Río Piedras, y como a las 3:00 de la tarde vendió allí mantecado de coco al demandante, así como también a otros estudiantes de la referida escuela.

"Que el demandante Felipe Castro Betancourt aquella misma noche se sintió enfermo y lo trasladaron al Hospital San Patricio, sufriendo de náuseas, vómitos, dolores estomacales, retortijones, diarrea, fiebre, pérdida abundante de flúidos y pérdida del conocimiento.

"Que el demandante . . . padecía de una gastroenteritis aguda y severa, y el Dr. José M. Torres le prestó sus servicios médicos, teniendo que permanecer en dicho hospital por razón de la referida enfermedad desde su ingreso en la noche del 27 al 28 de enero de 1950, . . . hasta febrero 3 de 1950 que fué dado de alta.

"Que la gastroenteritis aguda y severa que padeciera el demandante se debió, de acuerdo con el testimonio del Dr. José M. Torres, . . . al mantecado de coco que comió que le fuera vendido por el vendedor ambulante Félix Rodríguez.

"Que el demandante . . . ni ese día ni el día antes comió otros alimentos fuera del mantecado vendido por Félix Rodríguez que los que comiera corrientemente con sus familiares, ninguno de los cuales sufrió intoxicación alguna.

"Que la causa de la intoxicación del demandante . . . fué el mantecado que le vendió Félix Rodríguez.

"Que la corporación demandada Payco Incorporated estaba asegurada contra este riesgo por la corporación aseguradora The Great American & Indemnity Co."

Diez son los errores señalados por las demandadas en apelación. Éstos son que el tribunal inferior erró al declarar: (1) sin lugar su moción de *nonsuit;* (2) con lugar la demanda; (3) que las relaciones que mediaban entre el vendedor ambulante Félix Rodríguez y la codemandada Payco Inc. eran las de patrono y empleado; (4) que el artículo 1374 del Código Civil, ed. 1930, es de aplicación a la controversia planteada; (5) que la prueba del cuidado y la pericia en la preparación del mantecado vendido por la codemandada Payco Inc. era impertinente, que no era necesario el análisis químico de los vómitos del demandante y del artículo vendido y que basta la convicción moral del tribunal de que el mantecado estaba descompuesto para declarar con lugar la demanda; (6) que el mantecado estaba descompuesto; (7) que la intoxicación sufrida por el demandante fué debida al mantecado que le vendió Félix Rodríguez; (8) que en Puerto Rico se aplica, en lo concerniente a la venta de productos alimenticios, la doctrina conocida en algunos Estados de la Nación como la de "implied warranty"; (9) que bajo la anterior doctrina el demandante probó una acción de daños y perjuicios; y (10) al condenarles a pagar la suma de $150 para honorarios de abogado, a pesar de no haber sido ellos temerarios, y que dicha cuantía de honorarios es excesiva.

■■ Una moción de *nonsuit* no es otra cosa que una excepción previa a la prueba y admite la veracidad de cuanto en ésta es pertinente. Basta, además, que haya una *scintilla* de evidencia en la prueba ofrecida por la parte demandante para que tal moción sea declarada sin lugar. *José Malgor & Cía.* v. *B. Silva Sucrs.*, 70 D.P.R. 803. Es incuestionable que esa *scintilla* de evidencia existía en este caso.

■■ Por otra parte, si bien de acuerdo con la núm.

41 (*b*) de las Reglas de Enjuiciamiento Civil "Después que el demandante haya terminado la presentación de su evidencia, el demandado, sin renunciar al derecho de ofrecer evidencia en el caso de que la moción no sea concedida, podrá solicitar la desestimación fundado en que los hechos y la ley no demuestran que el demandante tenga derecho a un remedio," esa Regla no tiene el efecto que aparentemente le dimos en el caso de *Torres* v. *Marcano*, 68 D.P.R. 880. Al discutir en él la moción de *nonsuit* presentada por el demandado, analizamos tanto la prueba ofrecida por el demandante como la aducida por aquél y resolvimos que la corte inferior no erró al declararla sin lugar. A la página 882 de dicho tomo citamos, además, la parte de la Regla 41 (*b*) que ha sido copiada más arriba. Da la impresión ese caso de que un demandado puede insistir en apelación en su moción de *nonsuit*, no obstante haber ofrecido prueba en apoyo de su caso al serle declarada sin lugar su moción. Tal impresión es errónea. La Regla meramente dice que al terminarse la presentación de la prueba del demandante el demandado puede presentar una moción de *nonsuit*, sin que con ello renuncie su derecho a ofrecer evidencia. No dice la Regla, sin embargo, que si al ser declarada sin lugar la moción de *nonsuit* el demandado ofrece prueba en apoyo de su defensa, no renuncia con ello a su moción. Interpretando esa Regla en 5 Moore's *Federal Practice*, 2da. ed., se dice a la pág. 1041 que: "Si la moción (de *nonsuit*) es declarada sin lugar, el demandado puede proceder a ofrecer prueba. *Si así lo hace renuncia a cualquier derecho a objetar más tarde que su moción fué erróneamente desestimada*," (bastardillas nuestras) citando varios casos de tribunales federales y estatales. Consideramos que ésa es la interpretación correcta a ser dada a la parte copiada de la citada Regla y que al ofrecer su prueba, las demandadas renunciaron a su moción de *nonsuit*.(²)

_____

(²) El caso de *Torres* v. *Marcano*, 68 D.P.R. 880, debe considerarse revocado en tanto en cuanto el mismo pueda interpretarse como que resuelve que un demandado no renuncia a su moción de *nonsuit* si ofrece prueba en su defensa.

■ Surge de la prueba aducida que a Félix Rodríguez, al igual que a otros vendedores ambulantes, la demandada Payco Inc. entregaba diariamente cierta cantidad de los productos que fabricaba, proporcionándole para la venta de tales productos, gratuitamente, un carrito propiedad de ella que en sus costados llevaba el nombre de ésta; que él no pagaba por tales productos al momento en que los mismos le eran entregados cada mañana, sino que al regresar por las tardes entregaba el dinero correspondiente a los sorbetes vendidos y de ese dinero percibía un tanto por ciento; y que la Payco Inc. aceptaba la devolución de todos aquellos productos que le había entregado y él no había podido vender. La relación existente entre la Payco Inc. y Rodríguez era una de patrono y empleado. Así fué resuelto por este Tribunal en *Atiles, Admor.* v. *Comisión Industrial,* 68 D.P.R. 115. *Cf. Morales* v. *Otero,* 53 D.P.R. 569; *Lotti* v. *The Charles McCormick Lumber Co.,* 51 D.P.R. 334; *Fuentes* v. *Canetty,* 39 D.P.R. 173. En el primero de esos casos—*Atiles* v. *Comisión*—las relaciones de la aquí demandada Payco Inc. y la del vendedor de sus productos eran idénticas a las existentes entre ella y el vendedor ambulante Félix Rodríguez. Nos ratificamos ahora en ese criterio.

■ Los artículos 1373, 1374 y 1375 de nuestro Código Civil, ed. 1930, textualmente copiados rezan así:

"Artículo 1373.—El vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hacen impropia para el uso a que se la destina, o si disminuyen de tal modo este uso que de haberlos conocido el comprador, no la habría adquirido, o habría dado menos precio por ella; pero no será responsable de los defectos manifiestos o que estuvieren a la vista ni tampoco de los que no lo estén, si el comprador es un perito que por razón de su oficio o profesión, debía fácilmente conocerlos.

"Artículo 1374.—El vendedor responde al comprador del saneamiento por los vicios o defectos ocultos en la cosa vendida aunque los ignorase.

"Esta disposición no regirá cuando se haya estipulado lo contrario, y el vendedor ignorara los vicios o defectos ocultos de lo vendido.

"Artículo 1375.—En los casos de los dos artículos anteriores, el comprador podrá optar entre desistir del contrato, abonándosele los gastos que pagó, o rebajar una cantidad proporcional del precio, a juicio de peritos.

"Si el vendedor conocía los vicios o defectos ocultos de la cosa vendida y no los manifestó al comprador, tendrá éste la misma opción y además se le indemnizará de los daños y perjuicios, si optare por la rescisión."

" 'Sanear', según el eminente tratadista Sánchez Román, "equivale a dar cosa sana; es decir, a vender cosa respecto de la cual nadie pueda invocar y obtener el reconocimiento judicial de un derecho superior ni contrario a la integridad del trasmitido por el vendedor al comprador, en términos de que sea una realidad definitiva e irrevocable el cumplimiento de los fines de esencia en el contrato de compraventa, la trasmisión del dominio en la cosa vendida, del vendedor al comprador; así como que la cosa vendida no esté sujeta a otras cargas o gravámenes que los que hayan sido declarados al celebrarse la venta, y en los propios términos en que fuera aceptada por el comprador." (Bastardillas nuestras.) 4 Sánchez Román, Derecho Civil, pág. 569. Vicios o defectos redhibitorios "son aquéllos que pueden dar lugar a la redhibición." 10 Manresa, Código Civil Español, pág. 249, ed. 1950.

Al discutir los artículos 1484, 1485 y 1486 del Código Civil Español, que equivalen a los artículos 1373, 1374 y 1375 del nuestro arriba copiados, el ilustre tratadista Manresa, en el tomo y páginas dichos de su citada obra manifiesta que:

"La doctrina de los vicios redhibitorios se aplicó en un principio en Roma solamente a las ventas de animales; pero después, en el proceso evolutivo de aquel derecho y por razón de analogía, se generalizó dicha doctrina incluso a las ventas de los inmuebles; . . . . . Tiene por objeto la acción redhibitoria obtener la rescisión del contrato de compra y venta en

virtud de la existencia en la cosa de los defectos de que segui-
damente hablaremos, o empleando las palabras del Código,
llegar al desistimiento del contrato; y tiende la acción *quanti
minoris* o estimatoria a procurar la devolución de parte del
precio entregado por el comprador, en virtud también de esos
mismos defectos."
La aquí ejercitada no es, sin embargo, una acción redhibito-
ria ni estimatoria, sino una en que se reclama indemniza-
ción en dinero por los daños y perjuicios sufridos por el
demandante a consecuencia del mantecado que comió.

Si la acción del demandante tuviera que ceñirse estricta-
mente a lo dispuesto por los artículos 1373 y 1374 es natural
que la concesión de daños y perjuicios no procedería, puesto
que en armonía con lo dispuesto por el 1375, supra, en los
casos de los dos artículos que le preceden, el único remedio
del comprador es optar entre desistir del contrato, abonán-
dosele los gastos que pagó, o rebajar una cantidad propor-
cional del precio. No ha sido ése, repetimos, el propósito
de esta acción, sino el ya indicado en el párrafo anterior.
Por otra parte, si la acción tuviera que ajustarse a lo pre-
ceptuado por el artículo 1375, tampoco podría prosperar, ya
que para tener derecho a ser indemnizado en daños y per-
juicios el demandante tendría que alegar y probar que optó
por la rescisión del contrato. Como de acuerdo con el ar-
tículo 1247 del Código Civil "la rescisión obliga a la devo-
lución de las cosas que fueron objeto del contrato con sus
frutos y del precio con sus intereses" y "sólo podrá llevarse
a efecto cuando el que la haya pretendido pueda devolver
aquello a que por su parte estuviese obligado," para poder
acogerse a lo dispuesto por el artículo 1375 el demandante
tendría que alegar y probar no sólo que ha sufrido daños,
sino también que está dispuesto a devolver, y en condiciones
de devolver, la cosa que sirvió de objeto al contrato. En casos
como el presente en que el objeto del contrato es un alimento
que ha sido comido por el comprador, la devolución del mismo
resulta físicamente imposible. Por tanto, el artículo 1375

tampoco es de aplicación. *Cf.* Manresa, op. cit., vol. 10, pág. 251 y vol. 8, pág. 142.

La Ley núm. 72 de 26 de abril de 1940 (pág. 493) conocida como "Ley de Alimentos, Drogas y Cosméticos de Puerto Rico", dispone en su artículo 2 (*c*) que "El término 'alimento' significará (1) artículos usados como alimento o bebida por el hombre u otros animales, . . . . ;" (³) en su artículo 2 (*p*) que "Las disposiciones de esta Ley respecto a la venta de alimentos, . . . . se considerarán que incluyen también la *fabricación*, *producción*, *elaboración*, empaque, exhibición, oferta, posesión y tenencia de cualquiera de dichos artículos para la venta; . . . . ;" en su artículo 3 que "Quedan por la presente *prohibidos* en Puerto Rico los siguientes actos, o permitir que los mismos se ejecuten: (*a*) La *fabricación, venta o entrega, tener u ofrecer en venta, alimento* . . . . alguno adulterado o fraudulentamente rotulado. . . . . (*c*) Recibir en el comercio, *alimento*, . . . . *alguno adulterado* . . . . y la entrega u oferta de entrega del mismo mediante pago o de otro modo;" y en su artículo 10 que "Un alimento se considerará adulterado: (*a*) (3) si consiste total o parcialmente de alguna substancia morbosa, contaminada, inmunda, pútrida o descompuesta, o si de otro modo resulta inadecuado para servir de alimento." (Bastardillas nuestras.) En su consecuencia, cuando el fabricante de un artículo alimenticio lo pone a la venta para el consumo humano, la presunción es que ha dado cumplimiento a la ley, (⁴) que ha puesto en el mercado un artículo no adulterado y que garantiza que es apropiado para el fin a que el producto se destina.

--------

(³) Es innegable que el mantecado de coco en cuestión entra de lleno en la definición de la palabra alimento dada por la Ley 72, supra.

(⁴) De acuerdo con el artículo 464 del Código de Enjuiciamiento Civil —artículo 102 de la Ley de Evidencia— "Todas las demás presunciones serán satisfactorias, si no fueren contradichas. Se denominan presunciones disputables y pueden controvertirse mediante otra evidencia. Corresponden a esta clase las siguientes: . . . 32.—que la ley ha sido acatada."

En la mayoría de los Estados de la Unión se sigue en casos de esta índole la regla de garantía implícita (*implied warranty*) o sea la de que la persona que sirve o vende un producto alimenticio para el consumo humano garantiza de manera tácita que el producto es sano y apropiado para ser consumido por el hombre. Véase la monografía que aparece en 7 A.L.R. 2d 1027 y siguientes. Esa doctrina es de aplicación en Puerto Rico según los preceptos de la antes mencionada Ley 72 de 1940.

En el Estado Louisiana, donde existe un Código Civil con artículos que guardan cierta similitud con los del nuestro arriba copiados, se ha resuelto que el vendedor de un producto para el consumo humano es responsable de los daños y perjuicios que pueda sufrir el comprador si el producto resulta ser nocivo a la salud. *Boyd* v. *J. C. Penny Co.*, 195 So. 87; *Ogden* v. *Rosedale Inn*, 189 So. 162; *Kelly* v. *Ouachita Dairy Dealers Cooperative Association*, 175 So. 499; *MacLehan* v. *Loft Candy Stores*, 172 So. 367, en los cuales se establece el principio de que toda persona tiene conocimiento de las cualidades buenas o malas, de las cosas que fabrica en el ejercicio de su arte, oficio o negocio y que el no tenerlo se le imputa como una falta (*fault*) que le hace responsable en favor de los adquirentes de los productos por ella fabricados, de los daños y perjuicios resultantes de los vicios o defectos en los mismos, que no puso en conocimiento de éstos y que los compradores ignoraban. Bajo la doctrina de garantía implícita ya enunciada, igual principio es aplicable en esta jurisdicción.

Resolviendo un caso de naturaleza similar al aquí envuelto—no en cuanto a sus hechos sino en cuanto al derecho envuelto—el Tribunal Supremo de los Estados Unidos en el caso de *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108, manifestó a la pág. 116: "Pero cuando el vendedor es la persona que hace o fabrica la cosa vendida, la presunción lógica es que ella entiende el proceso de su manufactura, y *tiene conocimiento de cualquier defecto latente causado por tal proceso,*

contra el cual una razonable diligencia de su parte le hubiera protegido. Esta presunción está justificada, en parte, por el hecho de que el fabricante o manufacturero a virtud de su ocupación se hace pasar ante el público como persona competente para fabricar artículos razonablemente adaptados a los fines para los cuales tales artículos, o artículos similares, son dedicados . . . Si el comprador descansó, y bajo semejantes circunstancias tenía derecho a descansar, en el criterio del vendedor, que fué la persona que fabricó o hizo el artículo, *la ley implícitamente establece la garantía de que el producto es razonablemente adecuado para el uso que se le fabricó, estando el vendedor en aquel momento informado del propósito de dedicarlo a ese uso.*" (Bastardillas nuestras.) Véanse también sobre el particular 4 Tulane L. Rev., 600, 627 y 632, nota 85; *Pullman Palace Car Co. v. Metropolitan Street R. Co.*, 39 L. ed. 632, 638.

■ Fué, desde luego, un error del tribunal a quo concluir que la acción del demandante se basaba en el artículo 1374 del Código Civil. Tal error, sin embargo, no lleva consigo la revocación de la sentencia. La apelación se da contra ésta y no contra los fundamentos de la opinión.

■ El tribunal a quo concluyó, como hemos visto, que las náuseas, vómitos, diarreas, etc. sufridos por el demandante fueron producidos directamente por el mantecado de coco que él comió. Su conclusión encuentra apoyo en la prueba. Al llegar a esa conclusión dió crédito al testimonio del Dr. José M. Torres, a la declaración del propio demandante y a la de su testigo Francisco Estrada, quien a preguntas de su abogado manifestó que el día en cuestión Castro Betancourt y él trabajaban en la construcción de una pared y a la hora de recreo ambos salieron a tomar helado Payco; que después de haber pasado el recreo y de haber reiniciado el trabajo Castro Betancourt empezó a quejarse y a decir que se sentía mal, manifestándole luego que sentía dolor y convulsiones; que en vista de eso él sintió deseos de provocarse vómitos por temor a que le pasara algo malo a él

también y cuando llegó a su casa se sintió con diarreas y al otro día también, "pero tomé unos guarapillos y no me pasó nada y volví a la escuela al otro día;" y que otras personas compraron mantecado ese día y unas cuantas de ellas me dijeron que se sentían con vómitos.

La ley no exige que un hecho se pruebe con certeza matemática, sino con razonable certeza. *Colón* v. *Shell Co. (P. R.) Ltd.*, 55 D.P.R. 592, 620; artículo 366 Código Enjuiciamiento Civil, ed. 1933; artículo 4, Ley de Evidencia. Con la prueba que tuvo ante sí, el tribunal a quo pudo llegar a la conclusión ya indicada, sin necesidad de que se analizaran químicamente los vómitos del demandante o el mantecado que se le vendió a éste. *Cf. Bark* v. *Dixson et al.*, 131 N. W. 1078.

■ La condena en honorarios de abogados es imperativa cuando a juicio del tribunal sentenciador la parte perdidosa ha sido temeraria. Ley 94 de 1937 (pág. 239).(5) Al condenar en este caso a las demandadas al pago de tales honorarios, la presunción es que dicho tribunal concluyó que éstas lo habían sido. *Font* v. *Pastrana*, 73 D.P.R. 247. No nos es posible decir que al así concluir, el tribunal inferior estuviera equivocado, ni que la suma concedida sea exagerada.

■ Ahora bien, en lo que sí se equivocó el tribunal a quo fué al hacer constar en su sentencia que los intereses legales se pagarían desde la fecha de la radicación de la demanda. En casos de esta naturaleza, tales intereses han de pagarse desde la fecha en que se dicta la sentencia. *Sosa* v. *Sucn. Morales*, 58 D.P.R. 360; *Frías* v. *Berríos*, 58 D.P.R. 137; *Miranda* v. *P. R. Ry., Light & Power Co.*, 50 D.P.R. 974. Este error, sin embargo, ni ha sido señalado por las apelantes ni debe dar motivo a la revocación de la sentencia.

*Debe modificarse la sentencia apelada en el sentido de*

---

(5) Véase también la Ley núm. 411 de 11 de mayo de 1951, pág. 1095, enmendatoria, asimismo, del artículo 327 del Código de Enjuiciamiento Civil.

*conceder los intereses desde la fecha en que se dictó la sentencia, y así modificada será confirmada.*